UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| MATTHEW CARTER,<br><br>              Movant,<br><br>      vs.<br><br>UNITED STATES OF AMERICA,<br><br>              Respondent. | 4:23-CV-04007-KES<br><br>REPORT AND RECOMMENDATION |

## INTRODUCTION

This matter is before the court on the *pro se* motion of Matthew Carter to vacate, correct, or set aside his sentence pursuant to 28 U.S.C. § 2255.  See Docket No. 1.[1]  Now pending is a motion by the United States ("government") to dismiss Mr. Carter's motion without holding an evidentiary hearing.  See Docket No. 22.  Mr. Carter opposes the motion.  See Docket Nos. 25-31, 34-37. This matter was referred to this magistrate judge for a recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and DSD LR 57.11.

---

[1] Documents cited from this civil habeas file will be cited using the court's assigned docket number.  Documents from Mr. Carter's underlying criminal case, United States v. Carter, 4:21CR-40073-KES (D.S.D.), will be cited using the court's assigned docket number preceded by "CR."

## FACTS

### A.    Pretrial Proceedings

In the fall of 2020, Mr. Carter was on parole with the state of South Dakota.  State v. Carter, 66 CRI 21-00016 at p. 1782 (First Judicial Circuit).  A few days before Christmas Day in 2020, Mr. Carter's girlfriend, Nycole Morkve, had a conversation with her five-year-old daughter, E.W., in which E.W. indicated Mr. Carter had licked her genitals.  Id. at pp. 2566-67 (JT Vol. 1 at pp. 66-67).  Ms. Morkve broke up with Mr. Carter on Christmas Day, but did not immediately go to the police.  Id. at p. 2576 (JT Vol. 1 at p. 76).  Around December 21-31, Ms. Morkve discovered blood in E.W.'s underwear and took her to the emergency room.  Id. at p. 2580 (JT Vol. 1 at p. 80).  Doctors discovered the child was suffering from gonorrhea, which caused Ms. Morkve to disclose E.W.'s prior statement concerning Mr. Carter.  Id. at pp. 2563-64 (JT Vol. 1 at pp. 81-82).

On December 30, 2020, Mr. Carter was taken into custody in Yankton County, South Dakota and detained at the Yankton County Jail.  While detained at the jail, he made some recorded telephone calls and text messages urgently asking his father to retrieve certain items from above the ceiling tiles above the toilet in the bathroom of his home.  When police investigated, they found, among other things, a Western Digital hard drive containing numerous videos of child pornography hidden in the ceiling tiles above the toilet.

Mr. Carter was indicted on a charge of sexual contact with a child under the age of 16 in state court on January 11, 2021, which was later superseded

with a charge of first-degree rape of a child less than 13 years old. Id. at pp. 1, 59. On May 4, 2021, Mr. Carter was indicted in federal court on a single count of possession of child pornography between the dates of December 29, 2020, and January 14, 2021. CR Docket No. 1. His acts were alleged to violate 18 U.S.C. §§ 2252A(a)(5)(B), 2252A(B)(2), and 2256(8)(A). Mr. Carter made his initial appearance on this indictment via a writ out of state custody. CR Docket No. 4. Attorney Melissa Fiksdal was appointed to represent Mr. Carter in both the state case and the federal case. CR Docket No. 11; State v. Carter, 66 CRI 21-000016 at p. 73.

The government filed a notice pursuant to FED. R. EVID. 609(a)(1) that if Mr. Carter testified at trial, the government would seek to cross-examine him with three prior felony state court convictions: (1) a 2012 conviction for possession of a controlled substance, (2) a 2017 conviction for third offense DUI, and (3) a 2019 conviction for fourth offense DUI. CR Docket No. 20.

A superseding indictment was filed charging Mr. Carter with the same violation of law for possession of child pornography, but changing the dates to the nearly 11-year period of February 15, 2010, to January 14, 2021. See CR Docket No. 42. Mr. Carter availed himself of his right to a jury trial on this federal superseding indictment.

## B.    Jury Trial

The trial in federal court began on January 25, 2022, and continued until January 26, resulting in a guilty verdict. CR Docket Nos. entry after no. 66, 68, and 74. Prior to trial, the government filed a notice of intent to provide

expert testimony from Kendra Russell on the finding of digital evidence against Mr. Carter.  CR Docket No. 46.  The government also moved *in limine* to exclude evidence of a civil case filed against Yankton Police Officer Joseph Erickson, one of the witnesses the government intended to call at trial.  CR Docket No. 64.  The civil suit against Erickson alleged that Erickson had fabricated evidence; the civil suit was dismissed on summary judgment in Erickson's favor.  Id.

Prior to trial, Ms. Fiksdal requested a subpoena for Nycole Morkve and one for Steven Carter.  CR Docket Nos. 50 & 56.  Both requests were granted.  CR Docket Nos. 51 & 57.  Ms. Fiksdal also moved *in limine* to exclude from introduction at trial evidence of bestiality located on the Western Digital hard drive, and any reference to Mr. Carter's first-degree rape case involving a victim younger than 13 which was currently pending in Yankton County, South Dakota.  CR Docket No. 55.

At trial, the government called Mark Payer, the Jail Administrator for the Yankton County Sheriff's Office.  CR Docket No. 103 at p. 5 (JT Vol. 1 at p. 5). Officer Payer testified that the Yankton County Jail has a recording system that records phone calls and texts made by inmates.  Id.  Officer Payer testified that Mr. Carter was in custody at the jail in January 2021.  Id. at p. 7 (JT Vol. 1 at p. 7).  Mr. Carter had made some phone calls from the jail on January 14 and 18 that were recorded, as well as text messages from January 18 that were recorded.  Id.  Recordings and transcripts of the calls and text messages were introduced into evidence.  Id.

4

The government then called Officer Joseph Erickson.  Id. at p. 10 (JT Vol. 1 at p. 10).  Officer Erickson testified he worked for the Yankton Police Department from May 2015 until August 2021.  Id.  Officer Erickson testified he had contact with Mr. Carter on December 31, 2020 in order to interview him.  Id. at pp. 12-13 (JT Vol. 1 at pp. 12-13).  At the time, a black cell phone was seized from Mr. Carter and taken into evidence.  Id.  In the interview, Mr. Carter told Officer Erickson that he lived in a rented a two-bedroom home on Burleigh Street in Yankton and had been residing there for about nine months.  Id. at p. 14 (JT Vol. 1 at p. 14).  Although he did not have a roommate, he said his girlfriend and her five-year-old daughter sometimes stayed at the home with him.  Id. at pp. 14-15 (JT Vol. 1 at pp. 14-15).  Mr. Carter told Officer Erickson he had kicked his girlfriend out on Christmas Day after they broke up.  Id.

Officer Erickson testified Mr. Carter made a phone call to his father, Steven Carter, on January 14, 2021, at 9:33 a.m. instructing his father to go to Mr. Carter's house and obtain 4-5 items from above the ceiling tiles located above the toilet in the bathroom.  Id. at p. 22 (JT Vol. 1 at p. 22).  Officer Erickson listened to the recorded phone call and immediately set about obtaining legal authority to enter Mr. Carter's home and conducted a search of the home prior to noon that same day, January 14.  Id. at pp. 21, 40 (JT Vol. 1 at pp. 21, 40).  Officer Erickson testified that the sense of urgency in Mr. Carter's voice during this phone call led Officer Erickson to believe there were items of evidentiary significance in the home.  Id. at p. 22 (JT Vol. 1 at p. 22).

Police retrieved the following items concealed above the ceiling tiles above the toilet in Mr. Carter's bathroom:  a knife, an A Power mobile storage system, and a Western Digital computer hard drive.  <u>Id.</u> at pp. 22-23, 38 (JT Vol. 1 at pp. 22-23, 38).  These items were taken into evidence.  <u>Id.</u> at p. 25 (JT Vol. 1 at p. 25).  Officer Erickson turned over the storage system and the hard drive to Kendra Russell to examine.  <u>Id.</u> at p. 26 (JT Vol. 1 at p. 26).

On January 18, Mr. Carter texted his father, writing "I NEED YOU TO GET THAT S--T DAD!!!  Center tile by toilet!!!!  F—k!!!! I NEED YOU TO GET THAT S—T!!!!"  Govt. Ex. No. 7.  Following this text message, Mr. Carter again telephoned his father.  CR Docket No. 103 at p. 29 (JT Vol. 1 at p. 29).  Below is a partial transcript of Mr. Carter's statements to his father during this phone call:

> Okay.  I need you to, I need you to do this for me.  It's very, very, very f—king imperative, Dad, Okay?  If you love me, okay. . .

> Oh f—k no, no, I need you to turn around.  No, I'm serious.

> Kick the f—ker [door] in, I don't give a f—k.  I need you to go f—ing take care of this.  It's very important.  I can't have you f—king leave.  I can't have you leave without it.

> I can't, I can't have you leave without it.  Go now back!

> Dad, I'm not saying over the f—king phone call.  I'll, I'll walk you through how to f—king get it.  I need you to f—king get it.

> I need you to go to the f—king house Dad, now, please.  I f—king told you I need it something and I need you to f—king do this.  It's very important.

> Go kick the f—king door in.

> Why would you not do this?  Why?

6

You really don't give a f—k about me at all, don't you?  I f—king asked. . .

Dad, I need you to f—king do this.  It's very f—king important.

Okay, then I need you to go, stand on the f—king toilet.  I need you to f—king take care of this Dad.  It's very important.  If you don't f—king do it, if you . . .

I'm not f—king saying, G-d damn it!  I need you to f—king do this for me.  If you f—king care about me in any kind of way, I need to go the f—k back to my house right now and I need you to f—king take care of this Dad.  If you f—king love me in any f—king way, you're gonna f—king do this.  You're gonna f—king do this.

It's, [inaudible] it's in, it's on, it's it's, it's above the center tile.  You understand what I'm saying?

I hate you.  I f—king hate you.

No, I asked you to get something and you f—king didn't do it for me.

Dad, I asked you to do something for me last week when you were up there that I needed. . . And you f—king failed me.

So what you're saying is like there's, there was no ceiling on the f—king, on the bathroom at all huh?

<u>See</u> Govt. Ex. 1.

On cross-examination of Officer Erickson, Ms. Fiksdal established that Mr. Carter was in custody and his home was unattended between January 1 and 14, 2021.  <u>Id.</u> at p. 36 (JT Vol. 1 at p. 36).  She also established that there were a couple of apartments nearby to which law enforcement was frequently called.  <u>Id.</u> at p. 31 (JT Vol. 1 at p. 31).  Counsel also established that Officer Erickson was not aware whether there was a tenant who lived on the second floor of Mr. Carter's rental home.  <u>Id.</u>

Kendra Russell testified that she is a certified forensic computer examiner. Id. at pp. 47-48 (JT Vol. 1 at pp. 47-48). Her training includes reviewing not only computers, but also cell phones. Id. Ms. Russell forensically examined the two computer storage devices obtained by Officer Erickson. Id. at p. 49 (JT Vol. 1 at p. 49). She also examined Mr. Carter's cell phone. Id. The only item on which Ms. Russell found evidence of a crime was on the Western Digital drive. Id. at p. 53 (JT Vol. 1 at p. 53).

The Western Digital drive had several indicia that Mr. Carter was its owner, including a receipt addressed to him, several photographic images of him, and a letter he had authored. Id. at p. 55 (JT Vol. 1 at p. 55). The photographs were created between 2007 and 2008. Id. at p. 58 (JT Vol. 1 at p. 58). The letter from the hard drive was created June 1, 2012. Id. at p. 59 (JT Vol. 1 at p. 59). Ms. Russell also found 60 images of child pornography on the Western Digital hard drive. Id. at pp. 71-72 (JT Vol. 1 at pp. 71-72). The images were all saved to the hard drive in February and March 2010, but they had last been accessed for viewing on December 19, 2020. Id. at pp. 74, 88 (JT Vol. 1 at pp. 74, 88).

Ms. Russell also examined Mr. Carter's cell phone and found no child pornography on that device, but she did testify to various internet searches that Mr. Carter conducted using his phone. Id. at p. 91 (JT Vol. 1 at p. 91). Searches included terms for "dad daughter incest," "can a 5 year old little girl have an orgasm," "real incest sex pregnant impregnate," and other incest-related searches. CR Docket No. 70 at pp. 19-52 (JT Vol. 1 at pp. 19-52).

These searches all were conducted in December 2020. Id. In addition, Mr. Carter had downloaded onto his phone a scholarly article about incest. Id. at pp. 53-71 (JT Vol. 1 at pp. 53-71).

On cross-examination Ms. Russell admitted that she could not say who the person was who accessed the child pornography on the Western Digital hard drive on December 19, 2020. CR Docket No. 103 at p. 103 (JT Vol. 1 at p. 103). In addition, she reiterated that the cell phone did not access any images of child pornography nor did it have any such images downloaded onto it. Id. at p. 104 (JT Vol. 1 at p. 104). Ms. Russell also agreed that the Western Digital hard drive was examined for fingerprints and Mr. Carter's fingerprints were not found on that device. Id. at p. 113 (JT Vol. 1 at p. 113). Fingerprints were on the drive, but they were not suitable for comparison. Id. at p. 115 (JT Vol. 1 at p. 115). Ms. Russell found some tools on the Western Digital hard drive that would allow a user to anonymize an IP address. Id. An IP anonymizer would make it look like the user was somewhere else rather than the actual geolocation the user was at. Id. The defense did not put on any witnesses or evidence. CR Docket No. 104 at p. 6 (JT Vol. 2 at p. 147).

## C.    Sentencing

A draft presentence investigative report ("PSR") was filed calculating Mr. Carter's United States Sentencing Guidelines ("USSG") advisory sentencing range as follows. The base offense level was determined to be 18, two points were added because some of the child pornography involved children under the age of 12, four more points were added because some of the child pornography

9

was sadistic or masochistic, or portrayed sexual abuse or exploitation of an infant or toddler, two more points were added for use of a computer or interactive computer service to commit the crime, and five points were added because the offense involved more than 600 images.  CR Docket No. 84 at pp. 8-9, ¶¶ 16-20.  This resulted in a total offense level of 31.  Id. at p. 9, ¶ 27.

The draft PSR calculated Mr. Carter's criminal history points to be 19, which placed him in criminal history category VI.  Id. at p. 15, ¶ 49.  With a total offense level of 31 and a criminal history category of VI, the draft PSR calculated an advisory sentencing range of 188 to 235 months' imprisonment, but because the maximum penalty for the crime was 10 years, the draft PSR advised that the USSG range was capped at 120 months' imprisonment.  Id. at p. 22, ¶ 82.

The government objected, stating that the statutory maximum penalty was 20 years, not 10 years, and therefore the USSG range should not be capped at 120 months' imprisonment, but should be 188 to 235 months' imprisonment.  CR Docket No. 86.

Ms. Fiksdal did not file any objections to the draft PSR, but did file a sentencing memorandum asking the court to grant a downward variance or a downward departure.  CR Docket No. 87.  In the alternative, counsel requested a sentence at the bottom of the USSG range.  Id.  Counsel noted that the USSG calculation included a two-point upward adjustment in the base offense level due to use of a computer to possess the child pornography.  Id.  Counsel argued that nearly all child pornography in modern times involves use of a

10

computer, so this was not a special circumstance.  Id.  Counsel noted that
without the two-point enhancement for use of a computer, Mr. Carter's USSG
range would be 151-188 months' imprisonment.  Id.

Ms. Fiksdal also filed letters of support for Mr. Carter for the district
court to consider at sentencing.  CR Docket No. 88.  The letters emphasized the
hardships Mr. Carter experienced when his wife suffered an untimely death in
a motor vehicle accident in 2015.  Id.

A final PSR was filed in which the author accepted the government's
objection and amended the report to reflect a statutory maximum of 20 years'
imprisonment (240 months).  CR Docket No. 90 at p. 21, ¶¶ 81-82; CR Docket
No. 91-1.

At the sentencing hearing, Ms. Fiksdal indicated that Mr. Carter was still
maintaining his innocence, but she made several arguments in his favor for
leniency.  CR Docket No. 106 at pp. 3-4.  She noted that he had a number of
good qualities and was always a hard worker; he was always gainfully
employed.  Id. at pp. 5-6.  Counsel argued that Mr. Carter's life spiraled out of
control when his wife unexpectedly died, resulting in self-destructive behavior.
Id. at p. 4.  Counsel explained that Mr. Carter was sentenced in state court to
45 years in the penitentiary with 25 years suspended for his first-degree rape
conviction.[2]  CR Docket No. 106 at p. 7.  Counsel explained he would have to

---

[2] The final PSR indicated the facts of the state court case involved Mr. Carter
licking the genitals of a five-year-old girl and instructing her not to tell anyone.
CR Docket No. 91 at p. 15, ¶ 44.  Mr. Carter was infected with gonorrhea and,
upon testing, it was discovered that the little girl had that disease as well.  Id.

serve 50 percent of the resulting 20-year sentence (10 years) before he would be eligible for parole. Id. Counsel asked the court to make whatever sentence was imposed in federal court run concurrently with the state court sentence. Id. at p. 8.

Mr. Carter spoke at his sentencing where he maintained his innocence. Id. at pp. 11-13. He invoked themes of persecution for his Christian beliefs, and accused the prosecutor that he did not know Mr. Carter at all. Id. During his allocution, he specifically called out "Ms. Morkve" and accused her of persecution, hatred, and lies toward him. Id. at p. 12. Mr. Carter accused Ms. Morkve of betraying her own daughter and being deserving of the loss of her family and trust. Id.

The prosecutor spoke, acknowledging the death of Mr. Carter's wife, but noting that the child pornography was downloaded onto the Western Digital hard drive in 2010, five years before Mr. Carter's wife died. Id. at p. 21. The prosecutor argued Mr. Carter's criminal behavior could not be blamed on grief or trauma alone, and that he was, in fact, a dangerous person. Id. The government also emphasized that many defendants who collect child porn never act on it, while Mr. Carter did in fact act out his sexual interest in children, resulting in the state rape charges. Id.

The court accepted Ms. Fiksdal's argument that the two-point enhancement under the USSG for use of a computer was anachronistic and should not be applied. Id. at p. 25. Therefore, the court found Mr. Carter's advisory USSG range to be 151 to 188 months' custody. Id.

12

The district court sentenced Mr. Carter to 180 months' incarceration, with 60 months of the sentence to run concurrently with his first-degree rape sentence in state court, and 120 months of the sentence to run consecutively to that state court sentence.  CR Docket No. 98 at p. 2.  Mr. Carter was also ordered to pay $13,000 in restitution, $10,000 of that sum to the victim identified in the "Vicky" series of pornographic videos, and $3,000 to the victim identified in the "Tara" series.  Id. at p. 6.

**D.    Direct Appeal**

Mr. Carter timely appealed his conviction to the Eighth Circuit.  United States v. Carter, No. 22-1823, 2022 WL 3867685 (8th Cir. Aug. 30, 2022) (Per curiam).  The court found the district court's sentence to be substantively reasonable, noting that the sentence imposed was below the USSG range.  Id. at *1.  The court also found that the government's evidence at trial was sufficient to sustain the verdict.  Id.

**E.    Mr. Carter's § 2255 Motion**

Mr. Carter timely filed a motion to vacate, set aside or correct his sentence with this court pursuant to 28 U.S.C. § 2255.  Docket No. 1.  Because Mr. Carter has filed numerous other pleadings, seemingly raising additional claims, the court will attempt to accumulate all such claims regardless of which document they appear in.  As the court understands them, here are Mr. Carter's claims:

1.    Actual innocence

2.    Ineffective assistance of counsel—failure to investigate

13

3.    Third-party perpetrator

4.    Ineffective assistance of counsel—threatening Mr. Carter not to testify

5.    Malicious prosecution

6.    Lack of time to review discovery

7.    Ineffective assistance of counsel—defense lawyer was working for the government

8.    Ineffective assistance of counsel—failure to impeach police officers

9.    Sufficiency of the evidence—Mr. Carter was in jail from December 30, 2020, to January 14, 2021, and there were no fingerprints on the hard drive from Mr. Carter

10.    Miranda rights were never read to Mr. Carter

11.    The government never obtained an indictment

12.    Illegal detention without charges from December 30, 2020, to January 11, 2021

13.    The January 14, 2021, search violated Mr. Carter's Fourth Amendment rights—the warrant did not describe the address, location or residence to be searched

14.    Ineffective assistance of counsel—Officer Erickson was never impeached with evidence he had a civil suit filed against him for falsifying evidence

15.    Prosecutorial misconduct

16.    Kellie Marnette and Tyler Larson[3] maliciously prosecuted Mr. Carter

17.    Ineffective assistance of counsel—failure to call Nycole Morkve and Lynn Carter to testify

_____

[3] These were prosecutors in Mr. Carter's state court prosecution.  See Docket No. 24 at p. 6; see also State v. Carter, 66 CRI 21-00016 at pp. 47-48.

18.    The District Court judge's failure to recuse themselves—
       because the judge had also presided over the civil suit
       against Officer Erickson

19.    Ineffective assistance of counsel—failure to present alibi
       defense

20.    Ineffective assistance of counsel—failure to move to
       suppress the results of the search of Mr. Carter's residence
       pursuant to a facially deficient search warrant

21.    Search of Mr. Carter's black Xiaomi Mi 8 cell phone violated
       the Fourth Amendment because it was not obtained
       pursuant to the search warrant for Mr. Carter's residence

22.    Ineffective assistance of counsel—failure to move to
       suppress the results of the search of Mr. Carter's black
       Xiaomi Mi 8 cell phone

23.    Arrest of Mr. Carter on December 31, 2020, violated the
       Fourth Amendment—Mr. Carter told Officer Erickson he did
       nothing wrong, which eliminates probable cause for the
       arrest, none of the electronic devices found on Mr. Carter's
       person contained anything illegal, and his formal arrest
       warrant was not issued until January 12, 2021

24.    Mr. Carter committed the offenses prior to 2015, which
       means the Amy, Vicky & Andy Child Pornography Assistance
       Act of 2018, and the Justice for Victims of Trafficking Act of
       2015 should not apply to Mr. Carter's sentencing

25.    The District Court violated the *Ex Post Facto* clause by
       ordering Mr. Carter to pay restitution to two victims depicted
       in the videos

See Docket Nos. 1, 8, 10, 24, 29, 31, 34.

The government now moves to dismiss all of Mr. Carter's claims without

holding an evidentiary hearing.  Docket No. 22.  Mr. Carter opposes the motion.

Docket Nos. 25-26 & 34-35.

**DISCUSSION**

**A.    Scope of a § 2255 Motion**

Section 2255 of Title 28 of the United States Code was enacted to

supersede habeas corpus practice for federal prisoners.  Davis v. United States,

417 U.S. 333, 343-44 (1974).  Section "2255 was intended to afford federal

prisoners a remedy identical in scope to federal habeas corpus."  Id. at 343.

Prior to the enactment of § 2255, habeas claims had to be brought in the

district where the prisoner was confined, resulting in overburdening those

districts where federal correctional institutions were located and presenting

logistical issues because the record in the underlying criminal case was often

in a distant location.  United States v. Hayman, 342 U.S. 205, 212-16 (1952).

The enactment of § 2255 resolved these issues by requiring that the motion be

filed in the sentencing court.  Id.

Section 2255 allows a federal prisoner to "vacate, set aside or correct" a

federal sentence "upon the ground that the sentence was imposed in violation

of the Constitution or laws of the United States, or that the court was without

jurisdiction to impose such sentence, or that the sentence was in excess of the

maximum authorized by law, or is otherwise subject to collateral attack."  28

U.S.C. § 2255(a).  Where the allegation for relief is *not* based on a violation of a

Constitutional or federal statutory right or an assertion that the court was

without jurisdiction, the Supreme Court has read a "fundamentality"

requirement into § 2255—relief is available for only those errors which

constitute a "fundamental defect which inherently results in a complete

16

miscarriage of justice" or "an omission inconsistent with the rudimentary demands of fair procedure."  Hill v. United States, 368 U.S. 424, 428 (1962); see Peguero v. United States, 526 U.S. 23, 27-30 (1999) (noting collateral relief may be appropriate when a movant is prejudiced by a court's error).

Generally, petitioners are precluded from asserting claims pursuant to § 2255 that they failed to raise on direct appeal.  United States v. Frady, 456 U.S. 152, 162, 164-65 (1982); United State v. Darden, 915 F.3d 579, 586 (8th Cir. 2019) (same).  When a § 2255 petitioner asserts a claim that is procedurally defaulted because it was not raised on direct appeal, the claim can only proceed after the petitioner has shown either:  (1) actual innocence or (2) that the procedural default should be excused because there was both cause for the default and actual prejudice to the petitioner.  Bousley v. United States, 523 U.S. 614, 621-22 (1998); McNeal v. United States, 249 F.3d 747, 749 (8th Cir. 2001).  Therefore, barring a claim of actual innocence, a petitioner must show both cause for why he failed to raise an issue on direct appeal as well as actual prejudice caused by the alleged errors.  If a movant fails to demonstrate prejudice, the court need not address whether cause exists to excuse a procedural default.  Moore-El v. Luebbers, 446 F.3d 890, 898 (8th Cir. 2006).

Appellate courts generally refuse to review claims of ineffective assistance of counsel on direct appeal; such claims are, therefore, properly addressed in a 28 U.S.C. § 2255 motion such as the one here.  See United States v. Campbell, 6 F.4th 764, 776 (8th Cir. 2014); United States v. Lee, 374 F.3d 637, 654 (8th

Cir. 2004) ("[I]neffective assistance of counsel [claims] are generally not cognizable on direct appeal" and "may be heard only if a miscarriage of justice would otherwise result . . . or if the district court has developed a record on the issues."). Therefore, no procedural default analysis is required before examining petitioner's claims of constitutionally-deficient counsel.

This magistrate judge has taken judicial notice of the filings in Mr. Carter's underlying federal criminal case. Also, because it was necessary to understanding some of Mr. Carter's claims in this § 2255 case, the court has also taken judicial notice of the contents of Mr. Carter's state court criminal file, State v. Carter, 66 CRI 21-000016 (First Judicial Circuit).

## B.    Allegations Pertaining to the State Prosecution are Not Cognizable

A number of Mr. Carter's allegations pertain solely to his state court conviction, which is not the subject of this § 2255 motion.[4] Rather, this § 2255 motion is concerned only with the constitutionality of the federal prosecution of Mr. Carter for the federal crime described in the indictment and superseding indictment. The following claims should be dismissed as not cognizable because they pertain to Mr. Carter's state court prosecution:

5.    Malicious prosecution

11.    The government never obtained an indictment[5]

---

[4] Mr. Carter has a separate habeas action pending under 28 U.S.C. § 2254 collaterally attacking his state court conviction. See Carter v. South Dakota, 4:23-CV-04037-RAL (DSD).

[5] See CR Docket No. 1; see also State v. Carter, 66 CRI 21-000016 at pp. 1, 54. Indictments were obtained in both the state and federal cases. The court interprets Mr. Carter's argument to be that the state detained him between

12.   Illegal detention without charges from December 30, 2020, to January 11, 2021[6]

16.   Kellie Marnette and Tyler Larson[7] maliciously prosecuted Mr. Carter

23.   Arrest of Mr. Carter on December 31, 2020, violated the Fourth Amendment—Mr. Carter told Officer Erickson he did nothing wrong, which eliminates probable cause for the arrest, none of the electronic devices found on Mr. Carter's person contained anything illegal, and his formal arrest warrant was not issued until January 12, 2021[8]

This magistrate judge recommends that claims 5, 11, 12, 16 and 23 be dismissed as not cognizable because they pertain solely to Mr. Carter's state court conviction.

## C.   Claims That Are Procedurally Defaulted or Already Litigated

As indicated above, Mr. Carter is generally precluded from raising claims in this § 2255 motion that could have been, but were not, raised in his direct appeal. Frady, 456 U.S. at 164-65; Darden, 915 F.3d at 586. The following claims Mr. Carter asserts herein fall into this category:

10.   Miranda rights were never read to Mr. Carter

---

December 30, 2020, and January 11, 2021 (the date of the state court indictment) without an indictment.

[6] See Footnotes 5 and 9.

[7] These were prosecutors in Mr. Carter's state court prosecution. See Footnote 3.

[8] Mr. Carter was indicted in federal court May 4, 2021, and an arrest warrant was issued that same day. CR Docket Nos. 1 & 2. Therefore, Mr. Carter's earlier detention in December 2020 and January 2021 was not pursuant to this federal prosecution. The court infers that Mr. Carter's state detention was pursuant to a parole hold as he was on parole at the time E.W.'s allegations were disclosed to authorities.

13.    The January 14, 2021, search violated Mr. Carter's Fourth Amendment Rights—the warrant did not describe the address, location or residence to be searched

15.    Prosecutorial misconduct

18.    The District Court judge's failure to recuse themselves—because they also presided over the civil suit against Officer Erickson

21.    Search of Mr. Carter's black Xiaomi Mi 8 cell phone violated the Fourth Amendment because it was not obtained pursuant to the search warrant for Mr. Carter's residence

24.    Mr. Carter committed the offenses prior to 2015, which means the Amy, Vicky & Andy Child Pornography Assistance Act of 2018, and the Justice for Victims of Trafficking Act of 2015 should not apply to Mr. Carter's sentencing

25.    The District Court violated the Ex Post Facto clause by ordering Mr. Carter to pay restitution to two victims depicted in the videos

In addition to claims that could have been raised on appeal but were not, Mr. Carter is precluded from relitigating claims that were actually raised on appeal and decided.  United States v. Lee, 715 F.3d 215, 224 (8th Cir. 2013); Sun Bear v. United States, 644 F.3d 700, 702 (8th Cir. 2011) (en banc) (citing Davis, 417 U.S. at 346-47); United States v. Wiley, 245 F.3d 750, 752 (8th Cir. 2001); United States v. McGee, 201 F.3d 1022, 1023 (8th Cir. 2000) (Per curiam).  On appeal, Mr. Carter argued there was insufficient evidence to support his conviction.  Carter, 2022 WL 3867685 at *1.  Accordingly, the following claims are also precluded by the rule against relitigation:

3.    Third-party perpetrator

9.  Sufficiency of the evidence—Mr. Carter was in jail from
    December 30, 2020, to January 14, 2021, and there were no
    fingerprints on the hard drive from Mr. Carter

Mr. Carter can excuse his procedural default on the above claims by (1)

showing cause and prejudice or (2) asserting a claim of actual innocence.

Davis, 417 U.S. at 346-47; Sun Bear, 644 F.3d at 702 n.3; Wiley, 245 F.3d at

752 (citing Weeks v. Bowersox, 119 F.3d 1342, 1350-51 (8th Cir. 1997) (en

banc)).Mr. Carter asserts the latter.

"Actual innocence"—the only example of "miscarriage of justice" so far

recognized by the Supreme Court—is not an independent constitutional claim

upon which habeas relief can be granted; instead, it is "a gateway through

which a habeas petitioner must pass to have his otherwise [procedurally]

barred constitutional claim considered on the merits." Schlup v. Delo, 513

U.S. 298, 315 (1995). "Actual innocence means factual innocence," it does not

mean "mere legal insufficiency." Bousley, 523 U.S. at 623. Actual innocence

claims are rarely successful as they require the petitioner to carry an exacting

burden. Schlup, 513 U.S. at 324.

Actual innocence can be a gateway to excuse "severely confined

categor[ies] of cases" involving procedural defaults: expiration of the statute of

limitations, successive petitions (reasserting claims previously asserted in an

earlier petition), abusive petitions (asserting claims that could have been but

were not asserted in an earlier petition), failure to raise a constitutional claim

on direct appeal, failure to develop facts in state court, and failure to observe

21

state procedural rules, including filing deadlines.  McQuiggin v. Perkins, 569 U.S. 383, 386, 392-93, 395 (2013).

In order to show actual innocence, Mr. Carter must (1) produce "new reliable evidence" not presented previously; and (2) he must "show that, in light of all the evidence, it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt of the crime for which he pleaded guilty and was convicted."  Schlup, 513 U.S. at 324; United States v. Apker, 174 F.3d 934, 938-39 (8th Cir. 1999).

Evidence is "new" only if it was not available at the time of the trial and if it "could not have been discovered earlier through the exercise of due diligence."  Johnson v. Norris, 170 F.3d 816, 818 (8th Cir. 1999).  A petitioner can make the new evidence showing only where he demonstrates that the factual basis for the evidence did not exist at the time of the plea, and could not have been presented earlier.  Id.  The evidence must not only be "new" but it must also be "reliable."  Schlup, 513 U.S. at 324.

Here, Mr. Carter supplies four affidavits from himself, one from his former girlfriend Nycole Morkve[9], and one from his mother Lynn Carter.  See Docket Nos. 10, 16, 28, 29, 30, & 31.  None of this constitutes new evidence.

_____

[9] Given Mr. Carter's statements at sentencing regarding Ms. Morkve and Ms. Morkve's testimony at Mr. Carter's state court trial, the court is more than surprised that Ms. Morkve was willing to supply an affidavit for Mr. Carter's use in his § 2255 proceeding.  See CR Docket No. 106 at p. 12; State v. Carter, 66 CRI 000016 at pp. 2258 et seq.  At the state trial, Ms. Morkve testified she cut off all contact with Mr. Carter after they broke up on December 25, 2020, and had only spoken to him once in the ensuing 15 months when he called her from jail.  Id. at pp. 2558-59 (JT Vol. 1 at pp. 76-77).  In addition, the

Ms. Morkve was subpoenaed by Ms. Fiksdal for trial. CR Docket Nos. 50 & 51. Ms. Fiksdal interviewed Ms. Morkve and determined she could not provide any information that would have been beneficial to Mr. Carter at trial. Docket No. 13 at p. 2, ¶ 7 (Ms. Fiksdal's affidavit); Docket No. 28 at p. 2, ¶ 6 (Morkve affidavit). Ms. Morkve's testimony was available at the time of trial and so it is not "new evidence" sufficient to excuse procedural default. Schlup, 513 U.S. at 324; Apker, 174 F.3d at 938-39.

Likewise Ms. Fiksdal interviewed Mrs. Carter prior to trial. Docket No. 13 at p. 2, ¶ 7. She also determined that Mr. Carter's mother could provide no helpful information and determined not to call her as a witness. Id. Mrs. Carter's testimony was available at the time of trial and so it is also not "new evidence" sufficient to excuse Mr. Carter's procedural default. Schlup, 513 U.S. at 324; Apker, 174 F.3d at 938-39.

Finally, the evidence Mr. Carter asserts in his four affidavits also does not qualify as "new evidence." The "facts" asserted in the affidavits were all things Mr. Carter knew at the time his case went to trial or things he could have discovered prior to trial with the exercise of due diligence. Under the case law, this is not "new evidence." Id.

---

appearance of the affidavit submitted by Mr. Carter is somewhat irregular with the state and county appearing at the end of the affidavit instead of the top. See Docket No. 28. Finally, the affidavit also contains a curious artifact: there is a vertical line between the signature of Ms. Morkve and the notary public's attestation which is not part of the typewriting. Id. Despite these irregularities, the court accepts the affidavit at face value for purposes of evaluating Mr. Carter's claims in this matter.

Because Mr. Carter has not excused his procedural default, the court
recommends that claims 3, 9, 10, 13, 15, 18, 21, 24, and 25 be dismissed.
These claims were either actually litigated on direct appeal or could have been.
Mr. Carter claims "actual innocence" but fails to satisfy the exacting standard
under Schlup to show new evidence that was not known or could not have
been known at the time of trial with the exercise of due diligence.

## D.    Claims of Ineffective Assistance of Counsel

### 1.    Standard Applicable to Claims of Ineffective Assistance

Mr. Carter's 10 remaining claims (2, 4, 6, 7, 8, 14, 17, 19, 20, and 22) all
assert that Ms. Fiksdal rendered ineffective assistance of counsel to Mr. Carter.
The Sixth Amendment of the Constitution of the United States affords a
criminal defendant with the right to assistance of counsel.  U.S. CONST. amend.
VI.  The Supreme Court "has recognized that 'the right to counsel is the right to
the effective assistance of counsel.' " Strickland v. Washington, 466 U.S. 668,
686 (1984) (quoting McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970)).
Strickland is the benchmark case for determining whether counsel's assistance
was so defective as to violate a criminal defendant's Sixth Amendment rights
and require reversal of a conviction.  United States v. Kehoe, 712 F.3d 1251,
1253 (8th Cir. 2013).

"When a convicted defendant complains of the ineffectiveness of
counsel's assistance, the defendant must show that counsel's representation
fell below an objective standard of reasonableness." Strickland, 466 U.S. at
687-88.  The defendant must also show that counsel's unreasonable errors or

deficiencies prejudiced the defense and affected the judgment. Id. at 691. The defendant must show, "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Id. at 695. In sum, a defendant must satisfy the following two-prong test. Id. at 687.

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

Id.

"There is a presumption that any challenged action was sound trial strategy and that counsel rendered adequate assistance and made all significant decisions in the exercise of professional judgment." Hall v. Luebbers, 296 F.3d 685, 692 (8th Cir. 2002) (quotation omitted). It is the petitioner's burden to overcome this presumption, and a "petitioner cannot build a showing of prejudice on a series of errors, none of which would by itself meet the prejudice test." Id. Counsel's conduct must be judged by the standards for legal representation which existed at the time of the representation, not by standards promulgated after the representation. Bobby v. Van Hook, 558 U.S. 4, 7-9 (2009). " 'American Bar Association standards and the like' are 'only guides' to what reasonableness means, not its definition." Id. at 8 (quoting Strickland, 466 U.S. at 688).

The Supreme Court distinguishes between those cases "in which the new evidence 'would barely have altered the sentencing profile presented to the sentencing judge,' " and those that would have had a reasonable probability of changing the result. <u>Porter v. McCollum</u>, 558 U.S. 30, 41 (2009) (quoting <u>Strickland</u>, 466 U.S. at 700). In assessing the prejudice prong, it is important for courts to consider "the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding" and "reweigh it against the evidence in aggravation." <u>Id.</u> at 40-41 (quotations omitted). It is not necessary for the petitioner to show "that counsel's deficient conduct more likely than not altered the outcome" of his case, only that there is "a probability sufficient to undermine confidence in [that] outcome." <u>Id.</u> at 44 (quoting <u>Strickland</u>, 466 U.S. at 693-94). "Judicial scrutiny of counsel's performance must be highly deferential" with "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." <u>Strickland</u>, 466 U.S. at 689.

### 2.    Failure to Present an Alibi Defense

Mr. Carter alleges he had an alibi defense because he was in the Yankton County Jail and could not have accessed the child pornography on the Western Digital hard drive. But the facts do not support Mr. Carter's assertion of an alibi.

Mr. Carter, by his own admission, was detained in the Yankton County Jail from December 30, 2020, to January 14, 2021. The testimony at trial was that the last time someone accessed the child pornography on the Western

Digital hard drive was December 19, 2020.  See CR Docket No. 103 at pp. 74, 88 (JT Vol. 1 at pp. 74, 88).  By Mr. Carter's own admission, he was not in jail on December 19, 2020, and could easily have been the person who accessed the contraband on the Western Digital hard drive.

Ms. Fiksdal did have Mr. Carter sign releases, and she obtained all the dates that Mr. Carter was either in a jail, a treatment facility, or a penitentiary. Docket No. 13 at p. 4, ¶ 17.  Once that history was compiled, Ms. Fiksdal discovered that Mr. Carter was *not* incarcerated or in treatment at the key dates when the child pornography was downloaded (February through March 2010) or when it was most recently accessed (December 19, 2020) prior to Mr. Carter's December 30, 2020 arrest.  Id.  In addition, the computer forensics expert was asked to substantiate an alibi defense and he stated that there was no data that would support such a defense.  Id.

There was no alibi defense.  Thus, the court concludes Ms. Fiksdal did not render deficient representation by not presenting an alibi defense.

### 3.    Failure to Impeach Officer Erickson with Evidence of Civil Suit

Mr. Carter alleges that Officer Erickson was sued in a civil suit and accused of falsifying evidence.  He faults Ms. Fiksdahl for not impeaching Officer Erickson at trial with the evidence of this civil allegation against him.

But the civil lawsuit against Officer Erickson was the subject of a motion *in limine* by the government seeking the district court's ruling that such evidence be prohibited from introduction at trial.  See CR Docket No. 64.  That motion was granted.  CR Docket No. 103 at p. 4 (JT Vol. 1 at p. 4).

27

Accordingly, defense counsel was *prohibited* from raising the subject of this civil lawsuit during Mr. Carter's trial.  Counsel was not constitutionally ineffective for not attempting to violate the district court's order.

Mr. Carter also generally asserts that Ms. Fiksdal was ineffective for failing to impeach the police officers who testified at his trial.  But he fails to identify any avenue of cross-examination (except the civil suit discussed above) that he thinks Ms. Fiksdal should have pursued for impeachment.

Failure to effectively cross-examine a key prosecution witness can, under some circumstances, constitute ineffective assistance of counsel.  See, e.g. Steinkuehler v. Meschner, 176 F.3d 441, 444-45 (8th Cir. 1999).  However, in this case, Ms. Fiksdall *did* effectively and vigorously cross-examine each of the three government witnesses.  She established through Officer Erickson that Mr. Carter lived in an area that was the subject of frequent police calls and that his house had been unattended for a two-week period while Mr. Carter was detained at the Yankton County Jail.  She established through Ms. Russell that there were no fingerprints from Mr. Carter on the Western Digital hard drive and that Ms. Russell could not say who the person was who accessed the child pornography on the hard drive on December 19, 2020.  Counsel also established through cross-examination that none of the digital devices that Mr. Carter was found to have personal possession of contained any contraband.

Without Mr. Carter pointing to any specifics that he believes counsel failed to address, the court cannot evaluate whether Ms. Fiksdal's representation fell below accepted standards.

When a motion to dismiss is made, conclusory allegations do not suffice to rebut the motion.  Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009) (conclusory allegations do not suffice to rebut a Rule 12(b)(6) motion).  In the specific context of a habeas proceeding like Mr. Carter's, a petitioner must give details and specifics.  Spillers v. Lockhart, 802 F.2d 1007, 1009-10 (8th Cir. 1986) (vague and conslusory claims do not entitle a petitioner to relief).  Here, Mr. Carter's general claim of failure to cross-examine is vague and conclusory and, therefore, cannot merit relief under § 2255.

### 4.    Failure to Move to Suppress Evidence

Mr. Carter alleges Ms. Fiksdal was ineffective for failing to file a motion to suppress.  He argues she should have moved to suppress the results of the search of his black Xiaomi Mi 8 cell phone because the cell phone was not seized as part of the search of the ceiling tiles in his bathroom.  The court understands Mr. Carter to be suggesting the search of his cell phone took place without a warrant.  But Mr. Carter himself supplied the court with the search warrant for his cell phone.  See Docket No. 11 at pp. 7-9.  The search of his cell phone appears to have been undertaken pursuant to this warrant.  Id. Accordingly, Mr. Carter identifies no grounds for suppression of the various internet searches that were discovered on his cell phone.  It follows that he has

not identified any grounds for finding that Ms. Fiksdal was ineffective for failing to move to suppress.

If Mr. Carter was intending to argue that his cell phone was *seized* without a warrant, the court concludes that seizure was not in violation of Mr. Carter's Fourth Amendment rights. Two of the well-established exceptions to the warrant requirement are the search incident to arrest and the jail inventory search. Colorado v. Bertine, 479 U.S. 367, 371 (1987); United States v. Ball, 499 F.3d 890, 896 (8th Cir. 2007). By Mr. Carter's own account of events, his cell phone was taken from him when he was arrested and placed in the Yankton County Jail. Either of these exceptions to the warrant requirement would have authorized police to take his cell phone from him upon booking him into the jail. A motion to suppress the search of the phone would have been fruitless.

Mr. Carter also argues that Ms. Fiksdal should have moved to suppress the fruits of the search of his home whereby police discovered the Western Digital hard drive with its incriminating child pornography. He points to the same search warrant (Docket No. 11 at pp. 7-9), and argues the search warrant was facially defective because it did not describe his home or give an address, which was the place to be searched.

But the document at Docket No. 11, pp. 7-9 is *not* the search warrant that was issued for Mr. Carter's home. The search warrant for Mr. Carter's home was issued before noon on January 14, 2021. See CR Docket No. 103 at pp. 21-22, 40 (JT Vol. 1 at pp. 21-22, 40). The copy of the search warrant filed

by Mr. Carter at Docket No. 11, pp. 7-9, was issued the *following day*, on January 15, 2021.  See Docket No. 11 at p. 9.  This court infers that Officer Erickson seized the Western Digital hard drive on January 14 pursuant to the search warrant he testified he obtained for the residence, and then the next day, January 15, applied for a second search warrant to search the contents of the hard drive.

Mr. Carter has identified no grounds on which to suppress the fruits of the search of his home.  Accordingly, he has identified no grounds from which the court can conclude that Ms. Fiksdal was ineffective for failing to move to suppress the fruits of the search of his home.

### 5.    Failure to Call Witnesses

Mr. Carter asserts Ms. Fiksdal was ineffective for failing to call his former girlfriend, Nycole Morkve, and his mother, Lynn Carter, to testify at trial. Ms. Fiksdal met with and interviewed both of these potential witnesses and determined that they could not provide any testimony at trial that would be helpful to Mr. Carter.  Docket No. 13 at p. 2, ¶ 7.  Ms. Morkve's affidavit states that she was interviewed by both the government and Ms. Fiksdal and was not called to testify by either side.  Docket No. 28 at p. 2, ¶¶ 5-6.  Mrs. Carter's affidavit does not address contacts with either lawyer prior to trial.  Docket No. 30.

"[A] meaningful opportunity to present a complete defense does not translate into the right of a defendant to present any evidence he may deem important to his defense."  Strickland v. Lee, 471 F. Supp. 2d 557, 617 (W.D.

31

N.C. 2007).  Instead, to prove prejudice, Mr. Carter must show the proposed uncalled witness would have testified in his defense, that his testimony would have been favorable, and that his testimony "probably would have changed the outcome of the trial."  <u>Stewart v. Nix</u>, 31 F.3d 741, 744 (8th Cir. 1994) (citing <u>Lawrence v. Armontrout</u>, 900 F.2d 127, 130 (8th Cir. 1990)).  In assessing ineffective assistance claims under the <u>Strickland</u> standard, "[t]he decision not to call witnesses is a virtually unchallengeable decision of trial strategy." <u>United States v. Staples</u>, 410 F.3d 484, 488 (8th Cir. 2005) (citations omitted, punctuation altered).  The habeas court must avoid "the distorting effects of hindsight and try to evaluate counsel's conduct by looking at the circumstances as they must have appeared to counsel at the time."  <u>Id.</u> (citations omitted, punctuation altered).

"Complaints of uncalled witnesses are not favored . . . because allegations of what the witness would have testified [to] are largely speculative." <u>Evans v. Cockrell</u>, 285 F.3d 370, 377 (5th Cir. 2002).  "[T]he petitioner ordinarily should explain  . . . with some precision, the content of the testimony they would have given at trial."  <u>Lawrence,</u> 900 F.2d at 130.

Mr. Carter submitted affidavits from both Ms. Morkve and his mother. Ms. Morkve would have testified that Mr. Carter's father, Steven Carter, deposited two boxes containing various materials at Mr. Carter's home and among those materials were "a few hard drives" which did not belong to Mr. Carter.  Docket No. 28 at p. 1.

Lynn Carter's affidavit asserts that her ex-husband, Steven, and Mr. Carter both had access to the family's home computer in 2010 when all three were living in the same house.  Docket No. 30.  Mrs. Carter swears that Mr. Carter moved out in 2011 or 2012, after which he did not have access to the home computer.  Id.  Mrs. Carter states her ex-husband, Steven, was convicted of possessing child pornography in 2013 or 2014.  Id.

Mr. Carter asserts that if Ms. Fiksdal had called his mother and ex-girlfriend to testify, they could have established that the child pornography on the Western Digital hard drive did not belong to Mr. Carter and probably belonged to his father.  But, assuming that these women would have testified as set forth in their affidavits, it would not have changed the outcome of the trial.

First, if Mr. Carter did not own the hard drive and did not know what was on it, there would have been no reason for him to hide the device above the ceiling tiles above the toilet in his bathroom.  The hard drive would either have been discarded, or found in a box at the back of a closet somewhere in the house.

Second, the evidence at trial showed that someone accessed the child pornography on the Western Digital hard drive on December 19, 2020.  CR Docket No. 103 at pp. 74, 88 (JT Vol. 1 at pp. 74, 88).  Mr. Carter's father was not living with him, and from the context of the jail phone calls, he was not

even living in the same town as Mr. Carter.[10]  There was no evidence placing Steven Carter in Mr. Carter's house on December 19.  Neither of the two affidavits filed by Mr. Carter establish Steven Carter's presence in the house on December 19.

The only other persons who resided at Mr. Carter's home prior to December 25, 2020, were his girlfriend, Ms. Morkve, and Ms. Morkve's five-year-old daughter.  Neither is a likely person to have accessed the contents of the Western Digital hard drive on December 19.  A five-year-old would not have been able to reach the ceiling tiles and, while Ms. Morkve potentially could have reached the ceiling tiles, she gives no indication in her affidavit that she knew there was anything secreted above the ceiling tiles above the toilet when she was sharing a house with Mr. Carter.  See Docket No. 28.

Therefore, the only plausible conclusion one can reach is that Mr. Carter himself was the one who accessed the contents of the Western Digital hard drive on December 19, 2020.  He was living in the house, was capable of reaching the ceiling tiles, and (as the jail phone calls established) he was the only person with knowledge that there was anything hidden above the ceiling tiles.

---

[10] The trial subpoena issued for Steven Carter listed his address as Belle Fouche, South Dakota, which is about as far as you can get from Yankton, South Dakota, and still be in the same state.  See CR Docket No. 58.  Belle Fourche is over 400 miles away from Yankton.  See Mapquest.com, https://www.mapquest.com/directions/from/us/sd/yankton/to/us/south-dakota-belle-fourche-sd-282022861 (Last visited August 2, 2023).

Third, the material found on the Western Digital hard drive complimented the evidence of the internet searches found on the cell phone taken from Mr. Carter's person when he was arrested on December 31, 2020. These internet searches most definitely were conducted by Mr. Carter because they were found on his personal phone that was in his personal possession. Those internet searches involved topics such as incest involving children and sexual characteristics of very young children. See, e.g. CR Docket No. 70 at pp. 25, 36, 54-71 (Govt. Exs. 27, 29, & 32). Mr. Carter has presented no evidence to contravene the fact that these searches were attributed to him. The searches are circumstantial evidence that the child pornography on the Western Digital hard drive was Mr. Carter's.

Fourth, there were indicia of ownership on the Western Digital hard drive pointing to Mr. Carter as the owner. He drafted a letter dated June 1, 2012, which was saved on the hard drive on the same date. See CR Docket No. 70 at p. 16 (Govt. Ex. 16). This letter established that Mr. Carter was no longer living at his parents' home at this time, but in Jefferson, South Dakota, so the letter could not be an artifact carried over from the family computer. Id.

There was also a receipt saved on the hard drive for two OEM Motorola Batteries purchased by Mr. Carter May 18, 2010, and shipped to him at an address in North Sioux City, Iowa. Id. at pp. 17-18 (Govt. Ex. 17). Again, this shows Mr. Carter was adding documents to the hard drive after he had moved out of his parents' home, which further established his ownership of the hard drive and its contents.

Finally are the recorded phone calls Mr. Carter made from the Yankton County Jail on January 14 and 18, 2021. In these phone calls, Mr. Carter revealed that the items above the ceiling tiles above the toilet in his bathroom were of the utmost importance to him, and that he very urgently needed them removed from the house now that he had been arrested. If the contents of the Western Digital hard drive were unknown to Mr. Carter, he would not have been urgently requesting his father to retrieve that device and remove it from the house.

The court concludes that it was well within trial counsel's well-founded strategy not to call Ms. Morkve or Lynn Carter to testify at trial. Counsel conducted an appropriate investigation into each woman's purported testimony and determined their testimony would not be helpful at trial. Mr. Carter has not shown that this decision fell below the standard of reasonable legal representation nor has he shown that he was prejudiced by the decision.

The court notes that one week after Mr. Carter's federal trial, he was tried on his state charges in state court. State v. Carter, 66 CRI 21-000016 at pp. 2483 *et seq.* Ms. Morkve was called as the prosecution's first witness in that trial and her testimony was extremely incriminating to Mr. Carter. Id. at pp. 2558 *et seq.* Although this is hindsight, it appears that Ms. Fiksdal's judgment that Ms. Morkve's testimony would not be helpful to Mr. Carter was spot-on.

Although it is not clear whether Mr. Carter is also alleging that Ms. Fiksdal should have called his father, Steven Carter, as a witness, the

36

court addresses this additional claim.  Ms. Fiksdal did subpoena Steven Carter and interviewed him in the presence of her paralegal, Kara Duncan.  Docket No. 13 at p. 2, ¶ 6.  Mr. Carter had previously indicated to Ms. Fiksdal that his father had a prior conviction for possession of child pornography and he wanted Ms. Fiksdal to pursue a trial strategy of blaming the contents of the Western Digital hard drive on his father.  Id.  When Ms. Fiksdal interviewed Steven, he told Ms. Fiksdal that he pleaded guilty to the child pornography charge to protect his family and that, if called as a witness at Mr. Carter's trial, Steven would give testimony that would implicate Mr. Carter.  Id.  Counsel was not deficient in failing to call Steven Carter as a witness at trial.

### 6.    Failure to Review Discovery

Mr. Carter alleges that counsel did not review discovery with him and that he had no idea what the government's evidence against him was prior to trial.  Ms. Fiksdal explains in her affidavit that she spent over 10 hours meeting privately with Mr. Carter to discuss his case and then met with Mr. Carter and the defense computer forensic expert to discuss particularly the government's digital evidence against Mr. Carter.  Docket No. 13 at pp. 1-2, ¶¶ 3-4.  Ms. Fiksdal supports her allegations with a copy of her voucher containing contemporaneously-created time entries of activities she undertook on Mr. Carter's case.  Id. at pp. 6-11.

Despite the fact that Mr. Carter personally was present during his jury trial, he never points to any specific evidence of which he was unaware prior to his trial.  As discussed above, vague conclusory claims will not suffice to merit

habeas relief.  Iqbal, 556 U.S. at 679; Spillers, 802 F.2d at 1009-10.  Without

Mr. Carter supplying what discovery was unknown to him before trial, the

court cannot evaluate whether he was prejudiced by his alleged lack

of knowledge.

### 7.    Defense Counsel Was Working for the Government

Mr. Carter alleges that Ms. Fiksdal was working for the government, not

working for his own best interests.  He points to no evidence or specifics to

support his claim.  Ms. Fiksdal supplied an affidavit establishing that she was

not working for the government.  Docket No. 13.  This claim also fails because

of its vague and conclusory nature.  Iqbal, 556 U.S. at 679; Spillers, 802 F.2d

at 1009-10.

### 8.    Threatening Mr. Carter to Ensure He Did Not Testify

Mr. Carter alleges counsel was ineffective for threatening him not to

testify at his trial.  Ms. Fiksdal denies that she threatened Mr. Carter, but

acknowledges that she told Mr. Carter if he testified falsely or testified and was

convicted, the government might bring additional charges for obstruction of

justice or perjury or his testimony might result in an enhancement of his USSG

sentencing range for obstruction or perjury.  Docket No. 13 at p. 3, ¶ 8.

Ms. Fiksdal also stated that she explained how Mr. Carter's past

convictions could be used as impeachment evidence if he testified at trial.  Id.

at ¶ 9.  Ms. Fiksdal stated in her affidavit that Mr. Carter changed his mind

multiple times about whether to testify, but ultimately informed Ms. Fiksdal on

the morning of January 26, 2022 (day two of the trial), that he had decided ***not***

to testify.  Id.  Of course, Ms. Fiksdal's advisement to Mr. Carter of the

potential consequences of testifying at his trial do not amount to improper

threats or unlawful coercion, but only the valued advice of an experienced and

knowledgeable lawyer.

The accused has a constitutional right to testify in his own defense.

Rock v. Arkansas, 483 U.S. 44, 49 (1987).  The right to testify is one of the

"fundamental" rights the Supreme Court has recognized belongs to the accused

and only the accused.  Thomas v. United States, 737 F.3d 1202, 1208 (8th Cir.

2013).  Any waiver of the right to testify must be knowing and voluntary.

United States v. Bernloehr, 833 F.2d 749, 751 (8th Cir. 1987).

As the Eighth Circuit has noted, a defendant's silence when his lawyer

announces that the defense has rested its case without calling the defendant to

testify is sufficient to show a knowing and voluntary waiver of the right to

testify.  United States v. Gallardo, 970 F.3d 1042, 1048 (8th Cir. 2020) (citing

Frey v. Schuetzle, 151 F.3d 893, 898 (8th Cir. 1998)).  When counsel

announces that the defense rests without calling the accused to testify, the

defendant under these circumstances "must act 'affirmatively' rather than

apparently 'acquiesc[ing] in his counsel's advice that he not testify, and then

later claim[ing] that his will to testify was overcome.' " Frey, 151 F.3d at 898.

In Mr. Carter's case, defense counsel announced in open court in

Mr. Carter's presence at the start of the second day of trial that the defense

rested.  CR Docket No. 104 at p. 6 (JT Vol. 2 at p. 147).  Mr. Carter did not

object.  Id.  Accordingly, this record is sufficient to demonstrate a knowing and

voluntary waiver of Mr. Carter's right to testify.  Gallardo, 970 F.3d at 1048;

Frey, 151 F.3d at 898.

### 9.    **Failure to Investigate**

Mr. Carter alleges counsel was ineffective for failing to investigate, but he does not specify what she failed to investigate and what facts or witnesses she would have found had she investigated as Mr. Carter thinks she should have. Ms. Fiksdal has provided a detailed affidavit, supported by her contemporaneously-created time records, showing all that she did to investigate.  See Docket No. 13 at pp. 1-11.  She interviewed Mr. Carter; she interviewed Mr. Carter's former girlfriend, mother and father; she hired a forensic computer expert to analyze the digital evidence in Mr. Carter's case, and she reviewed all evidence provided by the government.  Id.  Ms. Fiksdal's office spent over 80 hours on his case and thoroughly investigated every avenue of defense known to them or identified by Mr. Carter.  Id.

Because Mr. Carter does not identify any avenue of investigation that Ms. Fiksdal did not pursue and indicate what she would have found if she had investigated that avenue, his claim fails for lack of specificity.  Iqbal, 556 U.S. at 679; Spillers, 802 F.2d at 1009-10.

### **CONCLUSION**

Based on the foregoing facts, law, and analysis, this magistrate judge respectfully recommends granting the government's motion to dismiss [Docket No. 22], and dismissing Mr. Carter's § 2255 motion [Docket No. 1] with prejudice.

It is further recommended that the following motions by Mr. Carter be denied as subsumed within the holdings of this opinion:

Docket No. 8—Motion for Mistrial

Docket No. 25—Motion for Judgment

Docket No. 26—Motion to Dismiss Government's Motion to Dismiss

Docket No. 34 and 35—Motions to Preserve Rights

**NOTICE TO PARTIES**

The parties have fourteen (14) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require *de novo* review by the district court. Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990); Nash v. Black, 781 F.2d 665, 667 and n.3 (8th Cir. 1986).

DATED this 8th day of August, 2023.

BY THE COURT:

_____
VERONICA L. DUFFY
United States Magistrate Judge